1    Jeffery L. Caufield (SBN 166524)
     jeff@caufieldjames.com
2    Kenneth E. James (SBN 173775)
     ken@caufieldjames.com
3    CAUFIELD & JAMES, LLP
     2851 Camino Del Rio South, Suite 250
4    San Diego, California 92108
     Telephone: 619-325-0441
5    Facsimile : 619-325-0231

6    Attorneys for Plaintiffs, Greve Financial
     Services, Inc., Angeles Chemical Company,
7    Inc., and John Locke

8

         **UNITED STATES DISTRICT COURT**

9       **NORTHERN DISTRICT OF CALIFORNIA**

10   ANGELES CHEMICAL COMPANY, INC.,
     et al.

11                 Plaintiffs,

12        vs.

13   McKESSON CORPORATION, a California
     Corporation, McKESSON CHEMICAL
14   COMPANY, FOREMOST-McKESSON
     EXPORT CORPORTION, MOREMOST-McKESSON
15   McKESSON CHEMICAL COMPANY INC.,
     and DOES 1 through 500, Inclusive,
16

17                Defendants.

Northern District Miscellaneous Matter No.
Case No. C 06-80343 Misc MMC (EDL)

Case No: 01-10532 TJH (Ex)
Central District of California

PLAINTIFF ANGELES CHEMICAL
COMPANY'S OBJECTIONS TO SQUIRE
SANDERS & DEMPSEY L.L.P'S JUNE 6,
2007 LETTER TO HONORABLE AND
SUBSEQUENT REFUSAL TO OBEY
MAGISTRATE LAPORTE'S ORDER
DATED MAY 31, 2007

Date: June 11, 2007
Time: 9:00 a.m.
Room: Courtroom E, 15th Floor
       450 Golden Gate Ave
       San Francisco, CA
Judge: Hon. Elizabeth D. Laporte

18

19

20

21

22

23

24

25

26

27

28

Angeles' Objection to SSD's June 6, 2007 Letter

Northern District Misc. Matter
Case No. C 06-90343 Misc MMC (EDL)

1    The May 31 Order only arose because SSD willfully, intentionally, and knowingly

2    violated that Courts' March 22 Order. Amazingly, SSD is now attempting to circumvent SSD's

3    obligations under the May 31 Order.

4    There is no excuse and certainly no risk of prejudice for SSD being ordered to submit all

5    the documents without being redacted for *in camera* review. It is the Court's judgment whether

6    or not the documents are relevant and privileged. In essence, SSD is usurping the power of the

7    Court. The only possible explanation for SSD's actions is that SSD is likely aware that some of

8    these documents will prove the extent of SSD's misrepresentations to the Court. SSD should be

9    ordered to submit all the documents without any redactions to the Court.

10

11    ***THIS IS THE SAME TYPE OF GAMESMANSHIP EMPLOYED BY MCKESSON'S***

       ***COUNSEL IN THE UNDERLYING LITIGATION***

12

13    Honorable Magistrate Judge James McMahon made recent determinations that McKesson

14    and its counsel have been disingenuous, dilatory and "hiding" evidence in this litigation.

15    Specifically, the court noted:

16    "**McKesson has a history of poor cooperation and candor in the discovery**

17    **process . . . The credibility of McKesson and its counsel in this action is frayed**
       **and spent . . . The court cannot and will not allow the discovery process to**
       **become a shell game in which a party and its counsel repetitively hide**

18    **available evidence.**" (Emphasis added.) (Declaration of Jeffery L. Caufield in
       Support of Plaintiff Angeles Chemical Company's Objections To Squire Sanders

19    & Dempsey L.L.P.'s June 6, 2007 Letter To Honorable And Subsequent Refusal
       To Obey Magistrate Laporte's Order Dated May 31, 2007 ("Caufield Dec.") ¶2:

20    Exhibit A)

21    Even more recently, the Honorable Magistrate Judge Charles Eick chastised McKesson

22    for withholding and redacting documents from *in camera* review. The exact **same**

23    **transgressions** as SSD is now attempting.

24    THE COURT: **When court orders you to produce documents**
       **for in camera review, how can you think that you're**

25    **authorized to withhold portions of the documents ordered to**
       **be submitted by redacting portions of the documents?**

26    MS. WILMS: They weren't encompassed in the motion because

27    they were non-McKesson chemical –

28

Angeles' Objection to SSD's June 6, 2007 Letter                Northern District Misc. Matter
                                                               Case No. C 06-90343 Misc MMC (EDL)

1    THE COURT:    **When a court orders you to produce all**
2    **documents, how can you believe that you were authorized to**
3    **produce only portions of the documents that the court has**
4    **ordered you to produce?**
5    MS. WILMS:  We in good faith thought we could do it on those
6    two documents or three documents since they didn't involve
7    McKesson chemical company sites.
8    THE COURT:  **The basis of your good faith is to decide that the**
9    **court order is too broad, given your view of the relevance of**
10   **the documents.  So, you're going to obey only part of the court**
11   **order that you believed to be overbroad. Is that what you're**
12   **saying?**
13   MS. WILMS:  That was not our intent, your Honor.
14   THE COURT: That's what you did, though, right?
15   MS. WILMS: There was the redaction on those couple of documents, yes, your
16   Honor. (Caufield Dec. ¶ 3: Exhibit B page 11)

Based on McKesson's egregious actions, the Court ordered McKesson to produce all

documents in their unredacted form to Angeles. . (Caufield Dec. ¶ 4: Exhibit C )  In this instance,

as the Court is aware, SSD concurrently represents McKesson on other litigation matters.  Thus,

once again another counsel from McKesson is simply refusing to comply with another Court's

order to produce document for *in camera* review.  Apparently, McKesson and it's counsel are

under the impression that McKesson and their counsel are not required to comply with court

orders.

### *THE PROPER PROCEDURE IS FOR SSD TO SUBMIT ALL DOCUMENTS IN THEIR UNREDATED FORM TO THE COURT*

SSD should not be allowed to shape the Court's Order for SSD's benefit.  SSD's action of

taking items off the privilege log and/or redacting documents so as to circumvent the Court's

review is entirely improper.  The Court must have access to all documents in unredacted form to

properly determine whether SSD should produce the documents.  It seems clear that in

withholding and redacting documents SSD now refuses to comply with the May 31, 2007 Order,

which was issued in order to compel SSD to comply with the earlier March 22, 2007 Order.

Angeles' Objection to SSD's June 6, 2007 Letter

2

Northern District Misc. Matter
Case No. C 06-90343 Misc MMC (EDL)

1  SSD's activity is highly improper and insults the very foundation of our legal system.

2  Angeles respectfully requests that the Court Order SSD to produce all the documents, unredacted

3  in their entirety to the Court to ensure that fair play and justice be served.

4  DATED: June 11, 2007                Caufield & James, LLP

5

6                                      Jeffery L. Caufield, Esq.
                                       Attorneys for Plaintiff/Counter-Defendant
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Angeles' Objection to SSD's June 6, 2007 Letter

3

Northern District Misc. Matter
Case No. C 06-90343 Misc MMC (EDL)

1 Jeffery L. Caufield (SBN 166524)
  jeff@caufieldjames.com
2 Kenneth E. James (SBN 173775)
  ken@caufieldjames.com
3 CAUFIELD & JAMES, LLP
  2851 Camino Del Rio South, Suite 250
4 San Diego, California 92108
  Telephone: 619-325-0441
5 Facsimile : 619-325-0231

6 Attorneys for Plaintiffs, Greve Financial
7 Services, Inc., Angeles Chemical Company,
  Inc., and John Locke

8            UNITED STATES DISTRICT COURT

9          NORTHERN DISTRICT OF CALIFORNIA

10 ANGELES CHEMICAL COMPANY, INC.,    )  Northern District Miscellaneous Matter No
   et al.                             )
11                                    )  Case No: 01-10532 TJH (Ex)
              Plaintiffs,             )  Central District of California
12                                    )
        vs.                           )  DECLARATION OF JEFFERY L.
13                                    )  CAUFIELD IN SUPPORT OF PLAINTIFF
                                      )  ANGELES CHEMICAL COMPANY'S
14 MCKESSON CORPORATION, a California )  OBJECTIONS TO SQUIRE SANDERS &
   Corporation, MCKESSON CHEMICAL     )  DEMPSEY L.L.P'S JUNE 6, 2007
15 COMPANY, FOREMOST-MCKESSON         )  LETTER TO HONORABLE AND
   EXPORT CORPORATION, MORELAND-      )  SUBSEQUENT REFUSAL TO OBEY
16 MCKESSON CHEMICAL COMPANY INC.,    )  MAGISTRATE LAPORTE'S ORDER
   and DOES 1 through 500, Inclusive, )  DATED MAY 31, 2007
17                                    )
              Defendants.             )  Date:  TBD
18                                    )  Time:  TBD
19                                       Room:  Courtroom E, 15th Floor
                                                450 Golden Gate Ave
20                                              San Francisco, CA
                                         Judge: Hon. Elizabeth D. Laporte

21

22 I, Jeffery L. Caufield, declare as follows:

23 1. I am an attorney of record for Plaintiffs and Counter-Defendants, Greve Financial

24    Services, Inc., a California corporation, Angeles Chemical Company, Inc., a California

25    corporation, Janyce Locke, an individual, and John Locke, an individual (collectively,

26    "Angeles") in the above entitled action.

27 2. Attached hereto as **Exhibit A** is a true and correct copy of United States District Court

28    Central District of California Order dated December 15, 2005.

                                            1
   DECLARATION OF JEFFERY L. CAUFIELD IN SUPPORT OF ANGELES' OBJECTION TO SSD'S JUNE 6,
                                      2007 LETTER

3.  Attached hereto as **Exhibit B** is a true and correct copy of a hearing transcript before Honorable Judge Charles Eick taken on November 17, 2006.

4.  Attached hereto as **Exhibit C** is a true and correct copy of United States District Court Central District of California Order dated November 17, 2006.

I declare under penalty of perjury that the foregoing is true and correct.  Executed in San Diego, California on June 11, 2007.

_____
JEFFERY L. CAUFIELD
Attorneys for Plaintiff/Counter-Defendant

2

# EXHIBIT A

04:03pm    From-US DISTRICT C    +2138944402    T-655    P.02/08    F-216

FILED
CLERK, U.S. DISTRICT COURT

DEC 15 2005

CENTRAL DISTRICT OF CALIFORNIA
BY                    DEPUTY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

GREVE FINANCIAL SERVICES, INC.,  )
ANGELES CHEMICAL COMPANY, INC.,  )
and JOHN LOCKE,                  )
                                 )    Civil No. CV 01-10532-TJH (Mcx)
              Plaintiffs,        )
                                 )    ORDER RE: PLAINTIFF'S MOTION
         v.                      )    TO COMPEL PRODUCTION OF
                                 )    DOCUMENTS
McKESSON CORPORATION, et al.,    )
                                 )
              Defendant.         )
─────────────────────────────────

On the court's own motion, the court dispenses with oral argument

with respect to the motion of plaintiffs Greve Financial Services,

Inc., Angeles Chemical Company, Inc., Janyce Locke, and John Locke

(collectively "Angeles") to compel production of relevant documents

from the underlying litigation, previously noticed for hearing on

December 20, 2005 and later continued to January 4, 2006. Local Rule

7.15. The court takes the motion under submission and decides it

forthwith.

Plaintiff Angeles Chemical Company, Inc. is or was a chemical

company which operated a chemical distribution facility on certain

1  real property in Santa Fe Springs from 1976 to 2000. Defendant

2  McKesson Corporation operated a chemical repackaging facility at an

3  immediately adjacent piece of real property ("the SFS real property")

4  from 1976 through 1986. Angeles alleges in this action that

5  McKesson's activities caused the contamination of Angeles' real

6  property. Among other things, Angeles alleges that McKesson

7  discharged hazardous chemicals and waste into a ditch adjacent to

8  McKesson's property which resulted in the contamination of the Angeles

9  property. McKesson contends in a counterclaim that Angeles

10  contaminated McKesson's site by pouring, spilling or releasing

11  solvents resulting in the contamination of the McKesson site,

12  groundwater beneath the McKesson site and the regional aquifer.

13      In 1989 and again in 1993, McKesson sued certain of its insurance

14  carriers to recover costs incurred to investigate and remediate

15  environmental contamination caused by McKesson and its employees in

16  various sites, including the McKesson SFS site. Eventually, McKesson

17  settled those lawsuits with its insurers.

18      The motion of plaintiff Angeles to compel production of documents

19  is granted.

20      McKesson has a history of poor cooperation and candor in the

21  discovery process in this action. McKesson was under an obligation to

22  produce to Angeles documents relevant to the claims of Angeles in this

23  law suit. McKesson initially produced thirteen boxes of documents, a

24  very small document production when considering that the requested

25  documents pertained to the operations of a chemical company at a large

26  facility which had been in operation for many years. For at least a

27  year, McKesson and its counsel adamantly asserted that no documents

28  other than those in the thirteen boxes were available. In May of

2

1   2004, McKesson and its counsel suddenly "found" an additional 179

2   boxes of documents pertaining to McKesson's earlier litigation with

3   its insurers concerning the SFS site. McKesson has now produced the

4   contents of 105 of these 179 boxes of documents.

5        Jeffery Caufield, counsel for Angeles, has filed a declaration in

6   support of this motion stating that (apparently after McKesson "found"

7   the 179 boxes of documents from the earlier litigation):

8        "McKesson had initially produced approximately 34 of

9   the 101 deposition transcripts from the Underlying

10  Litigation. Of the 34 deposition transcripts produced,

11  McKesson heavily redacted the majority of the deposition

12  transcripts based upon alleged "relevancy." Fortunately,

13  Angeles was able to locate a single court reporter that

14  still had one of the redacted deposition transcripts in

15  electronic format and discover that McKesson had redacted

16  direct questioning regarding the McKesson Santa Fe Springs

17  Site under their theory of "relevancy." In other words,

18  McKesson got caught red handed redacting highly relevant

19  information regarding SFS on a number of occasions."

20  Joint Stipulation, filed December 5, 2005, Declaration of Jeffery L.

21  Caufield Re Joint Stipulation, etc., p. 3, lines 1-9.

22       Defendant McKesson has not filed any evidence controverting Mr.

23  Caufield's allegations with respect to McKesson's actions redacting

24  the contents of the transcripts. Accordingly, the court accepts these

25  allegations as true for the purposes of this motion.

26       In opposing the present motion, McKesson claims through its

27  counsel that it has already produced all documents relevant to the

28  present action. McKesson claims that the remaining documents in the

3

1  179 boxes are privileged or pertain to issues like insurance coverage

2  which are not relevant to a claim or defense of any party and not

3  relevant to the subject matter of this action.

4  The credibility of McKesson and its counsel in this action is

5  frayed and spent. McKesson and its counsel claimed that it had

6  produced all available documents for at least a year before it

7  suddenly "found" 179 boxes of documents. McKesson and its counsel

8  redacted portions of deposition transcripts pertaining to the McKesson

9  SFS site claiming that this testimony was not relevant. Given this

10  history, the court cannot accept the unilateral representations of

11  McKesson and its counsel that documents from the 179 boxes withheld

12  from production are not relevant. The court cannot and will not allow

13  the discovery process to become a shell game in which a party and its

14  counsel repetitively hide available evidence.

15  Defendant McKesson Corporation is ordered on or before January 6,

16  2006 to produce the entire contents of the 179 boxes at issue in this

17  motion, withholding only documents as to which McKesson asserts a

18  claim of privilege supported by a privilege log. McKesson's

19  production shall include all documents previously produced unless

20  plaintiff Angeles, in its sole discretion, makes a determination that

21  McKesson need not produce certain documents which have already been

22  produced.

23  The motion of plaintiff Angeles for discovery sanctions is

24  denied. Although the conduct of defendant McKesson and its counsel

25  may well deserve sanctions, the declaration of plaintiff Angeles

26  concerning the time expended preparing and presenting this motion is

27  ///

28  ///

4

12-15-05   04:04pm   From-US DISTRICT CT        +2138044402        T-855   P.06/06   F-216

1   so vague and general that it is impossible for the court to determine

2   how much attorney time was expended which is directly attributable to

3   this motion.

4        IT IS SO ORDERED.

5

6   Dated:   December 15, 2005

7

8

9                                    JAMES W. McMAHON
                                     United States Magistrate Judge
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT B

11.17.06 10-K Hearing

1

```
 1
 2
 3
 4                    UNITED STATES DISTRICT COURT
 5                 CENTRAL DISTRICT OF CALIFORNIA
                        WESTERN DIVISION
 6
 7    ANGELES CHEMICAL COMPANY,     )
      ET AL.,                       )
 8                                  )
             PLAINTIFFS,            )
 9                                  )
         VS.                        )    CASE CV 01-10532-TJH(EX)
10                                  )
      MC KESSON CORPORATION, ET AL.,)    LOS ANGELES, CALIFORNIA
11                                  )    NOVEMBER 17, 2006
                                    )
12           DEFENDANTS.            )
13                                  )
                    _____
14
                            HEARING
15        BEFORE THE HONORABLE CHARLES F. EICK
               UNITED STATES MAGISTRATE JUDGE
16
17    APPEARANCES:
18    FOR ANGELES:     CAUFIELD & JAMES, LLP
                       BY:  JEFF CAUFIELD
19                          ATTORNEY AT LAW
                       2851 CAMINO DEL RIO SOUTH
20                     SUITE 250
                       SAN DIEGO, CALIFORNIA  92108
21    FOR MC KESSON CORP.:  BINGHAM MC CUTCHEN
                       BY:  NANCY WILMS
22                          ATTORNEY AT LAW
                       355 SOUTH GRAND AVENUE
23                     SUITE 4400
                       LOS ANGELES, CALIFORNIA 90071
24    PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING;
      TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE.
25
```

BABYKIN COURTHOUSE SERVICES (626) 963-0566

2

```
 1   APPEARANCES:  (CONTINUED)
                    Page 1
```

11.17.06 10-K Hearing

2    COURTROOM DEPUTY/    STACEY PIERSON
     RECORDER:

3    TRANSCRIBER:

4                         DOROTHY BABYKIN
                          COURT HOUSE SERVICES
                          1218 VALEBROOK PLACE
5                         GLENDORA, CALIFORNIA    91740
                          (626) 963-0566

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

BABYKIN COURTHOUSE SERVICES (626) 963-0566

                                  I N D E X                          3

1

2    CASE NO. CV 01-10532-TJH(EX)        NOVEMBER 17, 2006

3    HEARING:    ANGELES' MOTION TO COMPEL 10-K DOCUMENTS WITHHELD
                 BY MC KESSON AND FOR SANCTIONS.
                              Page 2

11.17.06 10-K Hearing

4

4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

BABYKIN COURTHOUSE SERVICES (626) 963-0566

1    LOS ANGELES, CALIFORNIA, FRIDAY, NOVEMBER 17, 2006

2    (CALL TO ORDER OF THE COURT.)

3        THE CLERK:  CALLING CIVIL 01-10532-TJH(EX), ANGELES

4    CHEMICAL COMPANY, INCORPORATED, ET AL. VERSUS MC KESSON

5    CORPORATION, ET AL.

6        APPEARANCES, PLEASE.
                    Page 3

11.17.06 10-K Hearing

7          MR. CAUFIELD:  JEFF CAUFIELD FOR PLAINTIFF AND

8    COUNTER-DEFENDANT ANGELES.

9          THE COURT:  THANK YOU.

10         MS. WILMS:  NANCY WILMS FOR DEFENDANT MC KESSON

11   CORPORATION.

12         THE COURT:  THANK YOU.

13         THIS MATTER'S BEFORE THE COURT FOR A HEARING ON

14   ANGELES' MOTION TO COMPEL 10-K DOCUMENTS WITHHELD BY

15   MC KESSON AND FOR SANCTIONS.

16         I'VE READ ALL OF THE PAPERS SUBMITTED IN CONNECTION

17   WITH THE MOTION.  I DON'T WANT TO HEAR ARGUMENT.  I DO WANT

18   TO HAVE SOME QUESTIONS ANSWERED, PLEASE, BY COUNSEL FOR THE

19   DEFENDANT.

20         FIRST OF ALL, HAS JUDGE HATTER RULED ON THE MOTIONS

21   FOR REVIEW OF THE COURT'S PREVIOUS ORDERS CONCERNING THE 10-K

22   ESTIMATES?

23         MS. WILMS:  NO, YOUR HONOR.

24         THE COURT:  DID MC KESSON WITHHOLD FROM PRODUCTION

25   ANY DOCUMENTS UPON WHICH MC KESSON RELIED IN CALCULATING ITS

                                                      5

BABYKIN COURTHOUSE SERVICES (626) 963-0566

1    FORM 10-K ESTIMATES THAT WERE NOT LISTED IN THE PRIVILEGE

2    LOG?

3          MS. WILMS:  NO, YOUR HONOR.  WE DID NOT REPRODUCE

4    DOCUMENTS THAT HAD ALREADY --

5          THE COURT:  NO.  NO.  NO.

6          MS. WILMS:  NO, YOUR HONOR.

7          THE COURT:  DON'T ANSWER A DIFFERENT QUESTION THAN

8    I ASKED.  LISTEN TO MY QUESTION CAREFULLY AND ANSWER IT,

Page 4

11.17.06 10-K Hearing

9      PLEASE.

10           HAS MC KESSON WITHHELD FROM PRODUCTION ANY

11     DOCUMENTS UPON WHICH MC KESSON RELIED IN CALCULATING ITS FORM

12     10-K ESTIMATES THAT WERE NOT LISTED IN THE PRIVILEGE LOG?

13           MS. WILMS:  NO, YOUR HONOR.

14           THE COURT:  THEN, WHY DID YOU REPRESENT TO JUDGE

15     HATTER ON SEPTEMBER 15 THAT SOME SUCH DOCUMENTS WERE NOT

16     PRODUCED?

17           MS. WILMS:  WE DID NOT REPRESENT THAT TO JUDGE

18     HATTER.  WHAT WE STATED IN OUR MOTION FOR REVIEW IS THAT WHEN

19     WE WERE RESPONDING HISTORICALLY TO FRCP 26 AND INTERROGATORY

20     NUMBER 4, WE DID NOT PRODUCE DOCUMENTS RELIED ON TO CALCULATE

21     10-K LIABILITIES BECAUSE THOSE DOCUMENTS WERE NOT CALLED FOR

22     IN THOSE PARTICULAR DISCOVERY REQUESTS.

23           FRCP, YOU DISCLOSE DOCUMENTS THAT YOU'RE GOING TO

24     RELY ON FOR YOUR DAMAGES CALCULATIONS.  AND WE DID THAT.  AND

25     INTERROGATORY NUMBER 4 WAS ALSO DIRECTED TO DAMAGES.  AND WE

BABYKIN COURTHOUSE SERVICES (626) 963-0566

6

1      RESPONDED TO THAT.

2           NOW, OBVIOUSLY, IF THERE WAS AN --

3           THE COURT:  SO, WHY WAS THAT -- WHY WAS THAT BIT OF

4      HISTORY -- IF THAT'S THE INTERPRETATION THAT YOU'RE PUTTING

5      ON YOUR REPRESENTATION TO JUDGE HATTER, WHY WAS THAT BIT OF

6      HISTORY AT ALL RELEVANT TO THE MOTION FOR REVIEW?

7           MS. WILMS:  WELL, WE WERE SAYING THAT WE HAD GIVEN

8      THEM THE DOCUMENTS RELATED TO DAMAGES.

9           THE COURT:  HAS MC KESSON NOW PRODUCED ALL

10     DOCUMENTS WHICH IT USED TO PREPARE THE SUMMARIES IDENTIFIED

11     IN THE PRIVILEGE LOG AND/OR PRODUCED IN THE PRODUCTION ON

Page 5

11.17.06 10-K Hearing

12  SEPTEMBER 15TH?

13      MS. WILMS: YES, YOUR HONOR, WITH REGARD TO SANTA

14  FE SPRINGS SITE. AND WE HAVE PRODUCED ANY SUCH DOCUMENTS

15  THAT WE HAVE IDENTIFIED AND EVERYTHING WITH REGARD TO SANTA

16  FE SPRINGS SITE.

17      THE COURT: WHAT ABOUT OTHER SITES?

18      MS. WILMS: WE ARE NOT ABLE TO RECREATE THE

19  DOCUMENTS, IF ANY, THAT WERE RELIED ON. THIS IS BASICALLY A

20  VERBAL PROCESS THAT IS UNDERGONE. AND FROM HISTORICALLY THE

21  -- JEAN MESCHER, THE PERSON, SAYS THAT SHE CANNOT RECALL

22  WHAT PARTICULAR BUDGETS WITH REGARD TO OTHER SITES SHE MAY OR

23  MAY NOT HAVE LOOKED AT, IF THERE WAS ANYTHING.

24      AND, SO, WE HAVE PRODUCED -- WE HAVE DILIGENTLY

25  SEARCHED AND PRODUCED EVERYTHING THAT WE CAN IDENTIFY THAT

7

BABYKIN COURTHOUSE SERVICES (626) 963-0566

1  WAS RELIED ON WITH REGARD TO --

2      THE COURT: WHAT DO YOU MEAN WHEN YOU SAY

3  REPEATEDLY IN YOUR DECLARATIONS AND OTHERWISE, "THAT YOU HAVE

4  IDENTIFIED"?

5      MS. WILMS: WELL, THAT --

6      THE COURT: IN YOUR ORDER TO PRODUCE EVERYTHING

7  THAT YOU HAVE, I DON'T CARE WHETHER YOU IDENTIFY IT OR NOT, I

8  WANT YOU TO PRODUCE EVERYTHING THAT YOU HAVE.

9      SO, WHAT IS THE MEANING OF THIS "THAT WE HAVE

10  IDENTIFIED" LANGUAGE?

11      MS. WILMS: WE'VE GIVEN EVERYTHING THAT WE KNOW.

12      THE COURT: HOW HARD HAVE YOU LOOKED?

13      MS. WILMS: THEY BOTH -- BOTH CAROL AND JEAN LOOKED

11.17.06 10-K Hearing

14    -- LOOKED HARD, LOOKED DILIGENTLY FOR SUCH DOCUMENTS.    AND

15    WE HAVE PRODUCED THEM.

16        THE COURT:    WHAT DID THEY DO?

17        MS. WILMS:    THEY'VE GONE BACK THROUGH THE FILES.

18    THEY -- JEAN IS THE ONE WHO'S IN CHARGE OF THE 10-K PROCESS.

19    SHE'S GONE BACK THROUGH HER FILES.    AND THAT'S WHERE THE

20    DOCUMENTS THAT WE DID PRODUCE CAME FROM.

21        THE COURT:    WERE ALL OF THE DOCUMENTS UPON WHICH

22    MC KESSON RELIED IN CALCULATING ITS FORM 10-K ESTIMATES

23    LISTED ON MC KESSON'S PRIVILEGE LOG?

24        MS. WILMS:    NO.    ONLY THE DOCUMENTS THAT WE WERE

25    CLAIMING PRIVILEGE OVER.

8

BABYKIN COURTHOUSE SERVICES (626) 963-0566

1        THE COURT:    THEN WHY IN YOUR SUPPLEMENTAL

2    OPPOSITION THAT GAVE RISE TO THE PRIOR ORDER DID YOU

3    REPRESENT THAT ALL THE DOCUMENTS SOUGHT WERE BOTH IRRELEVANT

4    AND PRIVILEGED?

5        MS. WILMS:    THE DOCUMENTS SOUGHT THAT WE HAD NOT

6    ALREADY PRODUCED -- I MEAN, I ASSUMED WE WEREN'T TALKING

7    ABOUT DOCUMENTS THAT HAD ALREADY BEEN PRODUCED IN THIS

8    LITIGATION.    JUST DOCUMENTS THAT HAD BEEN PREVIOUSLY

9    WITHHELD.

10        THE COURT:    LET ME BACK UP AND ANSWER -- ASK THE

11    QUESTION AGAIN NOW THAT I ASKED A FEW MINUTES AGO.

12    WERE ALL OF THE DOCUMENTS UPON WHICH MC KESSON

13    RELIED IN CALCULATING ITS FORM 10-K ESTIMATES LISTED ON THE

14    PRIVILEGE LOG?

15        MS. WILMS:    ONLY THOSE DOCUMENTS --

16        THE COURT:    YES OR NO.

Page 7

11.17.06 10-K Hearing

17    MS. WILMS:  OKAY.  THEN -- THEN, NO.  BECAUSE WE

18 HAD --

19    THE COURT:  OKAY.

20    MS. WILMS:  OKAY.

21    THE COURT:  WERE ANY DOCUMENTS UPON WHICH MC KESSON

22 RELIED IN CALCULATING ITS FORM 10-K ESTIMATES NOT LISTED ON

23 THE PRIVILEGE LOG AND NOT PREVIOUSLY PRODUCED?

24    MS. WILMS:  NONE THAT WE HAVE LOCATED THROUGH

25 DILIGENT SEARCH.

9

BABYKIN COURTHOUSE SERVICES (626) 963-0566

1    THE COURT:  WHEN YOU SAY THAT THERE WERE SOME

2 DOCUMENTS THAT MC KESSON RELIED UPON IN CALCULATING ITS FORM

3 10-K ESTIMATES THAT WERE NOT LISTED ON THE PRIVILEGE LOG BUT

4 PREVIOUSLY PRODUCED, WHEN WERE THEY PREVIOUSLY PRODUCED?

5    MS. WILMS:  OKAY.  AND I SHOULD CLARIFY HERE THAT

6 WE HAVE PRODUCED ALL OF THE --

7    THE COURT:  JUST ANSWER THE QUESTION, PLEASE.

8    MS. WILMS:  BUT --

9    THE COURT:  JUST ANSWER THE QUESTION.

10    MS. WILMS:  WELL, IT -- IT ASSUMES THAT MS. MESCHER

11 WOULD BE ABLE TO IDENTIFY A PARTICULAR DOCUMENT OR NOT.  SO,

12 IN OTHER WORDS, IF YOU PRODUCE AN ENTIRE UNIVERSE OF

13 DOCUMENTS, WHICH WE HAVE DONE, SHE MAY OR MAY NOT HAVE RELIED

14 ON CERTAIN OF THOSE DOCUMENTS.  THAT'S WHY I'M HAVING

15 DIFFICULTY BECAUSE I CAN'T SPEAK IN THE SPECIFICS LIKE I KNOW

16 THAT THIS PARTICULAR BUDGET OR THIS INVOICE WAS RELIED ON

17 BECAUSE SHE DOESN'T KNOW.

18    THE COURT:  AND YOU DON'T KNOW --

Page 8

11.17.06 10-K Hearing

19      MS. WILMS: BUT I --
20      THE COURT: -- WHAT WAS PREVIOUSLY PRODUCED?
21      MS. WILMS: BUT I CAN SAY EVERYTHING HAVING TO DO
22 WITH COSTS WITH REGARD TO THE SANTA FE SPRINGS SITE HAS BEEN
23 PRODUCED.
24      THE COURT: THAT'S NOT MY QUESTION.
25      MS. WILMS: SO -- THEN --

10

BABYKIN COURTHOUSE SERVICES (626) 963-0566

1      THE COURT: THAT'S NOT MY QUESTION.
2      MS. WILMS: THEN, I GUESS I SHOULD GO BACK TO
3 SAYING THAT EVERYTHING WE CAN IDENTIFY IS ON THE PRIVILEGE
4 LOG IN THE ENTIRE UNIVERSE. SOME OF WHICH SHE MAY HAVE
5 RELIED ON. WE JUST DON'T -- SHE JUST DOESN'T KNOW, SO.
6      THE COURT: SO, THE ANSWER ABOUT WHETHER THERE IS
7 -- LET ME ASK IT A LITTLE -- A LITTLE BIT DIFFERENTLY.
8      IS THERE ANY DOCUMENT ON WHICH YOU RELIED IN
9 CALCULATING THE FORM 10-K ESTIMATES THAT YOU KNOW ABOUT AS
10 BEING THAT TYPE OF DOCUMENT THAT WAS NOT LISTED ON YOUR
11 PRIVILEGE LOG?
12      MS. WILMS: NO.
13      THE COURT: SO, IS IT THE CASE THAT YOU KNOW --
14 AND, I MEAN, YOU, MC KESSON, KNOW THAT YOU DID RELY ON
15 DOCUMENTS IN CONNECTION WITH PREPARING THE CALCULATIONS. YOU
16 DID RELY ON DOCUMENTS OTHER THAN THOSE IDENTIFIED ON THE
17 PRIVILEGE LOG. BUT AT THIS POINT IN TIME YOU JUST CAN'T GO
18 BACK AND DETERMINE WHAT THEY WERE?
19      MS. WILMS: THAT'S CORRECT, YOUR HONOR. BUT WE'RE
20 SATISFIED IF IT HAS TO DO WITH SANTA FE SPRINGS, IT HAS
21 ALREADY BEEN PRODUCED. I MEAN, WE KNOW THAT.

Page 9

11.17.06 10-K Hearing

22    THE COURT: WELL, HOW COULD YOU POSSIBLY KNOW THAT
23 WHEN YOU DON'T KNOW WHAT IT IS THAT YOU RELIED UPON?
24    MS. WILMS: BECAUSE WE KNOW WE HAVE PRODUCED ALL
25 COST-RELATED DOCUMENTS.

11

BABYKIN COURTHOUSE SERVICES (626) 963-0566

1    THE COURT: WHEN A COURT ORDERS YOU TO PRODUCE
2 DOCUMENTS FOR IN CAMERA REVIEW, HOW CAN YOU THINK THAT YOU'RE
3 AUTHORIZED TO WITHHOLD PORTIONS OF THE DOCUMENTS ORDERED TO
4 BE SUBMITTED BY REDACTING PORTIONS OF THE DOCUMENTS?
5    MS. WILMS: THEY WEREN'T ENCOMPASSED IN THE MOTION
6 BECAUSE THEY WERE NON-MC KESSON CHEMICAL --
7    THE COURT: WHEN A COURT ORDERS YOU TO PRODUCE ALL
8 DOCUMENTS, HOW CAN YOU BELIEVE THAT YOU WERE AUTHORIZED TO
9 PRODUCE ONLY PORTIONS OF THE DOCUMENTS THAT THE COURT HAS
10 ORDERED YOU TO PRODUCE?
11    MS. WILMS: WE IN GOOD FAITH THOUGHT WE COULD DO IT
12 ON THOSE TWO DOCUMENTS OR THREE DOCUMENTS SINCE THEY DIDN'T
13 INVOLVE MC KESSON CHEMICAL COMPANY SITES.
14    THE COURT: THE BASIS OF YOUR GOOD FAITH IS TO
15 DECIDE THAT THE COURT ORDER IS TOO BROAD, GIVEN YOUR VIEW OF
16 THE RELEVANCE OF THE DOCUMENTS. SO, YOU'RE GOING TO OBEY
17 ONLY PART OF THE COURT ORDER THAT YOU BELIEVED TO BE
18 OVERBROAD.
19    IS THAT WHAT YOU'RE SAYING?
20    MS. WILMS: THAT WAS NOT OUR INTENT, YOUR HONOR.
21    THE COURT: THAT'S WHAT YOU DID, THOUGH, RIGHT?
22    MS. WILMS: THERE WAS THE REDACTION ON THOSE COUPLE
23 OF DOCUMENTS, YES, YOUR HONOR.

11.17.06 10-K Hearing

24     THE COURT: ANGELES SUGGESTS THAT THIS 10-K

25     LIABILITY ESTIMATE PROCESS HAS OCCURRED RELATIVELY RECENTLY,

12

BABYKIN COURTHOUSE SERVICES (626) 963-0566

1     MARCH OF 2006.  THERE AREN'T MANY DOCUMENTS ON THE PRIVILEGE

2     LOG DATED ON OR AFTER THAT TIME.  AND THAT'S NOT SO LONG AGO

3     THAT YOU WOULD THINK THAT MC KESSON COULDN'T RECONSTRUCT THAT

4     WHICH IT RELIED UPON IN CREATING THE ESTIMATES.

5         WHAT DO YOU HAVE TO SAY TO THAT?

6         MS. WILMS:  THOSE DOCUMENTS WERE PRODUCED.  I

7     DISAGREE WITH THE CHARACTERIZATION THAT THERE'S NOT --

8         THE COURT:  WELL, YOU SAID, "WERE PRODUCED."  WHAT

9     DO YOU MEAN, "WERE PRODUCED?"

10        MS. WILMS:  PURSUANT --

11        THE COURT:  THEY WERE ON A PRIVILEGE LOG?

12        MS. WILMS:  YES, YOUR HONOR.  YES, YOUR HONOR.

13        THE COURT:  THERE'S NOT VERY MUCH THERE.

14        MS. WILMS:  AND WE DISAGREE THAT THEY'RE -- THAT

15    THEY'RE NOT SUBSTANTIAL.  THEY HAVE ALL THE DIFFERENT SITES

16    AND THEY HAVE THE OPERATING COSTS FOR THE VARIOUS YEARS

17    ESTIMATED AND PREPARED BY JEAN MESCHER.  AND SHE IS IN HER

18    HEAD FAMILIAR WITH WHAT'S GOING ON WITH THESE SITES.  AND SHE

19    PREPARED THOSE SPREADSHEETS BASED ON THAT.  AND THAT IS --

20    THAT'S ALL THERE WAS.

21        THE COURT:  SO, IT'S JUST ALL IN HER HEAD?

22        MS. WILMS:  YES, YOUR HONOR.  THAT'S HER -- THAT'S

23    WHAT SHE DOES.

24        BUT I DO THINK THAT THERE ARE, YOU KNOW, A GOOD --

25    A GOOD CHUNK OF DOCUMENTS THAT ARE FROM MARCH OF 2006.

11.17.06 10-K Hearing

13

1       THE COURT:   HOW MANY?

2       MS. WILMS:   WELL, I'VE GOT THEM HERE.   ONE PACK

3   THAT STARTS "MCK0064865."   THAT'S THIS.

4       THE COURT:   WHAT NUMBERS ARE YOU READING OUT?

5       MS. WILMS:   THE BATES NUMBERS.

6       THE COURT:   WHY DON'T YOU JUST LOOK ON THE

7   PRIVILEGE LOG.

8       MS. WILMS:   OH, OKAY.   I'M SORRY, YOUR HONOR, I

9   DON'T HAVE THAT.   BUT I DO HAVE THE DOCUMENTS.

10      THE MAJOR PACKET IS THIS DOCUMENT, WHICH IS

11  MCK0064932.

12      WOULD YOUR HONOR LIKE ME TO HAND THESE TO THE

13  CLERK?

14      THE COURT:   NO.

15      MS. WILMS:   OKAY.   AND THEN --

16      (PAUSE IN PROCEEDINGS.)

17      THE COURT:   GOING BACK TO SOMETHING I ASKED YOU

18  ABOUT EARLIER.   YOU TOLD ME, I BELIEVE, THAT YOU HAD PRODUCED

19  PREVIOUSLY SOME DOCUMENTS THAT WERE SOUGHT BY PLAINTIFF IN

20  THE MOTION.   BEFORE THE COURT ORDER YOU HAD ALREADY PRODUCED

21  SOME DOCUMENTS.   YOU JUST CAN'T IDENTIFY WHICH DOCUMENTS THEY

22  WERE.

23      IS THAT ACCURATE?

24      MS. WILMS:   YES, YOUR HONOR, AS THEY RELATE TO

25  COSTS.

14

11.17.06 10-K Hearing

```
1         THE COURT:  YOU SAY IN -- SAID IN YOUR OPPOSITION

2    TO THE MOTION THAT ALL OF THE DOCUMENTS SOUGHT WERE

3    PRIVILEGED.

4         SO, WHY DID YOU PRODUCE PRIVILEGED DOCUMENTS

5    PREVIOUSLY?

6         MS. WILMS:  WE DIDN'T PRODUCE PRIVILEGED DOCUMENTS.

7    THE DOCUMENTS THAT WE HAD NOT PRODUCED WERE THE ONES THAT

8    WERE PRIVILEGED, THE ONES THAT WE COULD IDENTIFY -- YOU KNOW,

9    YES, THIS DOCUMENT FOR SURE WAS RELIED ON IN CALCULATING THE

10   10-K.  THOSE DOCUMENTS WERE PRIVILEGED.

11        THE COURT:  SO, THEY BECOME PRIVILEGED IF YOU CAN

12   IDENTIFY THEM?

13        MS. WILMS:  NO, THEY WERE PRIVILEGED DOCUMENTS.

14   THE ONES THAT WE COULD IDENTIFY WERE ALL PRIVILEGED.  THEY

15   WEREN'T PRIVILEGED BECAUSE WE COULD IDENTIFY THEM.

16        THE COURT:  WELL, I DON'T UNDERSTAND.

17        WHAT SEPARATED OUT THE DOCUMENTS THAT YOU HAD

18   PREVIOUSLY PRODUCED THAT YOU SAY WERE RESPONSIVE TO WHAT THEY

19   WERE SEEKING -- NAMELY, DOCUMENTS UPON WHICH YOU RELIED IN

20   CALCULATING YOUR FORM 10-K ESTIMATES.

21        WHAT SEPARATED THOSE DOCUMENTS, THE PREVIOUSLY

22   PRODUCED DOCUMENTS FROM A PRIVILEGE STANDPOINT FROM THE ONES

23   THAT YOU REFUSED TO PRODUCE AND PUT ON A PRIVILEGE LOG?

24        MS. WILMS:  THE PREVIOUSLY PRODUCED DOCUMENTS WERE

25   THINGS LIKE BUDGETS, INVOICES --
```

BABYKIN COURTHOUSE SERVICES (626) 963-0566

15

Page 13

```
1    THE COURT:  UH-HUH.

2    MS. WILMS:  -- YOU KNOW, HOW MUCH DOES IT COST.
```

11.17.06 10-K Hearing

3    SO, THEY WERE NOT PRIVILEGED DOCUMENTS. THEY WERE DOCUMENTS

4    HAVING TO DO WITH, YOU KNOW, HOW MUCH DOES IT COST TO PULL

5    THIS TANK FROM THE GROUND.

6         THESE DOCUMENTS THAT WERE ON THE LOG ARE DOCUMENTS

7    THAT WERE GENERATED PURSUANT TO THE ATTORNEY-CLIENT PROCESS

8    OF DETERMINING WHAT THE RESERVES WERE. BUT THAT PROCESS

9    DOESN'T MAKE, YOU KNOW, AN INVOICE FOR A TANK REMOVAL

10   PRIVILEGED.

11        THE COURT:  SO, WHEN PLAINTIFF SAID IN ITS MOTION

12   THAT IT WANTED PRODUCTION OF ALL OF THE DOCUMENTS RELIED UPON

13   BY MC KESSON TO CALCULATE ITS FORM 10-K LIABILITY, AND IN

14   RESPONSE MC KESSON SAID, "ALL OF THOSE DOCUMENTS ARE

15   PRIVILEGED," THAT WAS WRONG BECAUSE NOT ALL OF THOSE

16   DOCUMENTS WERE PRIVILEGED. SOME OF THOSE DOCUMENTS WERE NOT

17   PRIVILEGED AND HAD BEEN PREVIOUSLY PRODUCED.

18        THAT'S WHAT YOU'RE SAYING?

19        MS. WILMS:  ALL OF THE DOCUMENTS WE COULD IDENTIFY

20   FOR SURE AS HAVING BEEN RELIED ON WERE PRIVILEGED, SO.

21        THE COURT:  NO. NO. NO. LISTEN TO MY QUESTION

22   AND ANSWER IT, PLEASE.

23        ANGELES' MOTION ASKED FOR ALL OF THE DOCUMENTS

24   RELIED UPON BY MC KESSON TO CALCULATE ITS FORM 10-K

25   LIABILITY. IN RESPONSE TO THAT MOTION, MC KESSON SAID, "ALL

16

BABYKIN COURTHOUSE SERVICES (626) 963-0566

1    OF THOSE DOCUMENTS ARE PRIVILEGED." THAT'S WHAT

2    MC KESSON SAID --

3        MS. WILMS:  CORRECT.

4        THE COURT:  -- BOTH IN THE JOINT STIPULATION AND IN

Page 14

11.17.06 10-K Hearing

17

5     ITS SUPPLEMENTAL MEMORANDUM.

6            MS. WILMS:  YES.

7            THE COURT:  WHAT YOU'RE NOW SAYING IS THAT'S NOT

8     RIGHT BECAUSE SOME OF THE DOCUMENTS RELIED UPON BY MC KESSON

9     TO CALCULATE ITS FORM 10-K LIABILITY WERE NOT PRIVILEGED?

10           MS. WILMS:  NO, YOUR HONOR.  I'M --

11           THE COURT:  IS THAT NO?  WHY NOT?

12           MS. WILMS:  ALL THE DOCUMENTS -- BECAUSE WE DON'T

13    KNOW WHETHER ANY OF THESE OTHER COST DOCUMENTS WERE RELIED

14    ON.

15           THE COURT:  BACK UP, PLEASE.  BACK UP.  BACK UP.

16           MS. WILMS:  SO, IT'S --

17           THE COURT:  BACK UP.

18           THE MOTION ASKED FOR ALL DOCUMENTS UPON WHICH

19    MC KESSON RELIED TO CALCULATE ITS FORM 10-K LIABILITY.

20           IN OPPOSITION, MC KESSON DID NOT SAY, OH, SOME ARE

21    PRIVILEGED, SOME ARE NOT PRIVILEGED.  AND WE'VE PRODUCED

22    THOSE THAT ARE NOT PRIVILEGED.  MC KESSON SAID, THEY'RE ALL

23    PRIVILEGED AND HERE'S OUR PRIVILEGE LOG.

24           SO, I GUESS MY QUESTION -- THIS IS A DIFFERENT

25    QUESTION, IS WHY DID MC KESSON MAKE THOSE REPRESENTATIONS TO

BABYKIN COURTHOUSE SERVICES (626) 963-0566

1     THE COURT THAT IN OPPOSITION TO THE MOTION WHEN THEY WEREN'T

2     TRUE?

3            MS. WILMS:  YOUR HONOR, ARE YOU SPEAKING ABOUT THE

4     MOTION HERE, TODAY, THE SECOND?

5            THE COURT:  I THINK YOU KNOW WHAT MOTION I'M

6     TALKING ABOUT.  THE MOTION THAT GAVE RISE --

7            MS. WILMS:  WELL, I'M JUST TRYING TO --

Page 15

11.17.06 10-K Hearing

8          THE COURT:    -- TO THE AUGUST 30 AND THE SEPTEMBER

9   6TH ORDERS.

10         MS. WILMS:    OKAY.    I JUST WANTED TO CLARIFY.

11   THAT'S A TRUE --

12         THE COURT:    NO, YOU DIDN'T.    I THINK YOU JUST

13   WANTED TO CONFUSE.    BUT GO AHEAD.

14         MS. WILMS:    NO, I DIDN'T.    YOUR HONOR, I WOULD NOT

15   WANT TO DO THAT.

16         THE COURT:    PLEASE, PLEASE, LISTEN.

17         MS. WILMS:    THE STATEMENT IS A TRUE STATEMENT.

18         THE COURT:    WHICH IS A TRUE STATEMENT?

19         MS. WILMS:    THE STATEMENT THAT SAYS ALL OF THE

20   DOCUMENTS THAT WERE RELIED ON WERE ON THE PRIVILEGE LOG THAT

21   WE COULD IDENTIFY.

22         THE COURT:    NO.    NO.    THAT'S NOT WHAT YOU SAID.

23         (PAUSE IN PROCEEDINGS.)

24         MS. WILMS:    I APOLOGIZE FOR NOT HAVING WRITTEN THAT

25   OR FOR THAT NOT HAVING BEEN WRITTEN CLEARLY THEN.

                                                              18

BABYKIN COURTHOUSE SERVICES (626) 963-0566

1          (PAUSE IN PROCEEDINGS.)

2          THE COURT:    WHAT DOES IT TAKE TO IDENTIFY A

3   DOCUMENT ACCORDING TO THE WAY IN WHICH YOU'RE USING THE

4   TERMINOLOGY?

5          MS. WILMS:    IT TAKES A DILIGENT SEARCH OF RECORDS.

6   AND WHEN A DOCUMENT IS LOCATED THAT'S RESPONSIVE, THEN THAT'S

7   IDENTIFIED.

8          THE COURT:    RESPONSIVE TO WHAT?

9          MS. WILMS:    TO WHATEVER IT IS YOU'RE SEARCHING FOR.

Page 16

11.17.06 10-K Hearing

```
10   IN THIS CASE DOCUMENTS RELIED ON TO CALCULATE FORM 10-K

11   LIABILITY ESTIMATES.

12        THE COURT:   HOW DO YOU KNOW WHEN YOU'VE IDENTIFIED

13   SUCH A DOCUMENT?

14        MS. WILMS:   THE PERSON WHO IS INVOLVED IN DOING IT

15   -- THE PROCESS, WHICH IN THIS CASE WAS JEAN MESCHER, WOULD

16   SAY, YES, THIS IS SUCH A DOCUMENT.

17        THE COURT:   WELL, WOULDN'T THE FIRST STEP BE FOR

18   JEAN MESCHER TO SEARCH FILES AND MEMORY TO DETERMINE WHAT IT

19   WAS THAT JEAN MESCHER RELIED ON?

20        MS. WILMS:   YES, YOUR HONOR.

21        THE COURT:   AND EVERYTHING THAT WAS RELIED UPON IS

22   ON THE PRIVILEGE LOG EXCEPT THINGS ALREADY PRODUCED.

23        ALTHOUGH MC KESSON CAN'T IDENTIFY ANYTHING THAT WAS

24   ALREADY PRODUCED THAT WAS RELIED ON.

25        MS. WILMS:   YES, YOUR HONOR.


                 BABYKIN COURTHOUSE SERVICES (626) 963-0566

                                                              19


1         (PAUSE IN PROCEEDINGS.)

2         THE COURT:   WHO ELSE WAS INVOLVED IN THE

3    CALCULATION OF THE ESTIMATES?

4         MS. WILMS:   JEAN MESCHER WAS THE ONLY ONE INVOLVED

5    WITH REGARD TO THE ESTIMATES.

6         THE COURT:   NO ONE ELSE HAD ANY INPUT WHATSOEVER?

7         MS. WILMS:   NO, I DON'T BELIEVE SO.   I MEAN, IT'S

8    POSSIBLE SHE TALKED TO PEOPLE.   I KNOW SHE SAID IT WAS A VERY

9    VERBAL PROCESS.   SHE DIDN'T -- AND THERE WERE MEETINGS.   BUT

10   IT WAS DEFINITELY HER RESPONSIBILITY AND HER PROCESS.

11        THE COURT:   NO, THAT'S NOT MY QUESTION.

12        MS. WILMS:   AND THAT'S ALL I --
                            Page 17
```

11.17.06 10-K Hearing

13    THE COURT:  THERE'S DOCUMENTS.  THERE'S

14  CORRESPONDENCE.  THERE ARE NOTES.  YOU JUST SAID THERE WERE

15  MEETINGS.

16    SO, THERE ARE OTHER PEOPLE INVOLVED WHO HAD INPUT

17  INTO THE PROCESS OF CALCULATING THESE ESTIMATES, WEREN'T

18  THERE?

19    MS. WILMS:  YES, YOUR HONOR.  THERE WERE OTHER

20  PEOPLE AT THE MEETINGS.  YES.

21    THE COURT:  NO, THAT'S NOT MY QUESTION.

22    MS. WILMS:  YES.

23    THE COURT:  NOT WHETHER THERE WERE ANY PEOPLE AT

24  THE MEETINGS.

25    THE QUESTION, WAS ANYONE ELSE INVOLVED IN THE

20

BABYKIN COURTHOUSE SERVICES (626) 963-0566

1  PROCESS?  ANYONE ELSE HAVE INPUT INTO THE PROCESS OF

2  CALCULATING THE ESTIMATES?

3    MS. WILMS:  I BELIEVE WITH REGARD TO LEGAL, THE

4  ROLE OF LEGAL FEES, CAROLYN UNGVARSKY WAS INVOLVED.

5    THE COURT:  ANYONE ELSE?

6    MS. WILMS:  NOT THAT I KNOW OF, YOUR HONOR.

7    (PAUSE IN PROCEEDINGS.

8    THE COURT:  I THANK YOU, MS. WILMS.

9    MS. WILMS:  THANK YOU, YOUR HONOR.

10    THE COURT:  MR. CAULFIELD, DO YOU WANT JUST A FEW

11  MINUTES TO RESPOND?

12    MR. CAULFIELD:  SURE.

13    THE COURT:  I DON'T ENCOURAGE A LOT OF ARGUMENT.

14  I'VE READ ALL OF THE PAPERS.

Page 18

11.17.06 10-K Hearing

15    MR. CAUFIELD: OKAY.

16        THE COURT: BUT I'LL GIVE YOU A FEW MINUTES, GIVEN

17    THAT YOU'VE BEEN SITTING THERE LISTENING TO MS. WILMS ANSWER

18    THE COURT'S QUESTIONS.

19        MR. CAUFIELD: WELL, WITH A COUPLE OF ITEMS, FOR

20    EXAMPLE, WITH RESPECT TO THE PEOPLE THAT APPARENTLY

21    PARTICIPATE IN THE PROCESS, I WOULD CALL THE COURT'S

22    ATTENTION TO THE DOCUMENT BATES STAMPED NUMBER MCK0064930

23    FROM THE RESERVE DOCUMENTS PRODUCED.

24        IN THAT -- THIS DOCUMENT LISTS, I GUESS, A -- IT

25    SAYS ORAL, BUT I THINK IT'S PROBABLY LAUREL GONZALEZ AS BEING

21

BABYKIN COURTHOUSE SERVICES (626) 963-0566

1    PREPARED BY. SO, APPARENTLY, A DIFFERENT HUMAN BEING. JEAN

2    MESCHER DOESN'T ACTUALLY PREPARE THE SPREADSHEET.

3        AND THEN THERE'S TWO DIFFERENT PEOPLE THAT

4    APPARENTLY ARE ASSIGNED TO SIGN OFF ON THE ACTUAL SPREADSHEET

5    THAT'S BEEN PREPARED OR PRODUCED. THAT WOULD BE LISA SORKER

6    AND JEAN MESCHER. SO, THERE DOES APPEAR TO BE MORE PEOPLE

7    INVOLVED IN THE PROCESS.

8        AND IT'S SOMEWHAT INTERESTING THAT IF THERE'S A

9    PLACE FOR THESE PEOPLE TO SIGN OFF, WHY ISN'T THERE THE SIGN

10    OFF. IF WE HAVE THE ACTUAL DOCUMENT AS IT EXISTS, AND

11    THERE'S A SIGN-OFF COLUMN, YOU KNOW --

12        THE COURT: MAYBE THAT MEANS THEY DIDN'T HAVE

13    INPUT.

14        MR. CAUFIELD: I DON'T -- WELL, IT SAYS, "LIST

15    PREPARED BY," IS ALL I KNOW.

16        AND AS FOR SOME OF THE OTHER DOCUMENTS, THERE'S

17    CERTAIN QUESTIONS REGARDING -- FOR EXAMPLE, THE DOCUMENTS

11.17.06 10-K Hearing

22

18    BEGINNING WITH MCK0064906.

19        IF LOOKING AT THE BOTTOM OF THE DOCUMENT, THE

20    ACTUAL DOCUMENTS ARE BEING PRODUCED OUT OF MR. EDGCOMB'S --

21    OFF MR. EDGCOMB'S COMPUTER.  AND THIS IS FOR PRIOR YEARS.

22    WHICH IS SOMEWHAT CURIOUS BECAUSE I WOULD ASSUME THAT IF IT'S

23    BEING PRODUCED FROM COUNSEL'S FILES, THERE WOULD BE EMAILS OR

24    TRANSMITTAL LETTERS OR SOMEHOW HE WAS DELIVERED THESE

25    DOCUMENTS.

BABYKIN COURTHOUSE SERVICES (626) 963-0566

1        AND NOT ALL THE DOCUMENTS HAVE -- JUST A SCATTERING

2    NUMBER OF THESE, EVERY FEW PAGES -- YOU KNOW, THERE'S CLUMPS

3    THROUGHOUT THIS THING.  AND IT APPEARS THAT IT LOOKS LIKE

4    JUST PRINTOUTS OFF OF MR. EDGCOMB'S COMPUTER NOT OUT OF

5    MC KESSON CORPORATE FILES.  AND, AGAIN, THERE'S NO

6    TRANSMITTALS.

7        AND FINALLY --

8        THE COURT:  WHAT DIFFERENCE DOES THAT MAKE?

9        MR. CAUFIELD:  WELL, IT CALLS INTO QUESTION WHETHER

10    MC KESSON ACTUALLY -- WELL, FIRST OF ALL, THERE SHOULD BE AT

11    LEAST A TRANSMITTAL LETTER OR AN EMAIL.  WHICH ACCORDING TO

12    YOUR ORDER, WOULD HAVE BEEN SOMETHING THAT THEY SHOULD HAVE

13    LISTED ON A PRIVILEGE LOG AND SHOULD HAVE PRODUCED FOR YOUR

14    REVIEW SO THAT YOU COULD DECIDE WHETHER OR NOT THAT NEEDED TO

15    BE PRODUCED OR NOT IN THIS LITIGATION.  BECAUSE THAT SHOULD

16    BE A DECISION LEFT UP TO YOU, I WOULD ARGUE TO MAKE.

17        AND WITH RESPECT TO THE EMAIL THAT WE REFERENCED,

18    AGAIN, THERE'S ONLY -- DESPITE THE FACT THAT THIS HAS BEEN

19    APPARENTLY A PROCESS GOING ON SINCE 1990, I THINK WE HAVE A

Page 20

11.17.06 10-K Hearing

23

20    TOTAL OF ONE EMAIL PRODUCED. AND THIS IS THE ONE THAT WE HAD

21    AN ISSUE WITH REGARDING THE REDACTION.

22        AND I WOULD NOTE THAT THE EMAIL THAT WAS PRODUCED,

23    AND THEN THEY ATTEMPTED TO REDACT IT, THAT EMAIL ACTUALLY

24    SAYS THAT THEIR LEGAL COSTS HAVE BEEN PREVIOUSLY INCLUDED IN

25    THE ENVIRONMENTAL RESERVES AND, APPARENTLY, WERE SUPPORTING

BABYKIN COURTHOUSE SERVICES (626) 963-0566

1    SOME OF THE ENVIRONMENTAL RESERVE NUMBERS AND EXPENSES

2    REFLECTED IN THE SPREADSHEETS.

3        BUT, CERTAINLY, WE'VE NEVER SEEN ANY OF THE LEGAL

4    COSTS. AND IT WOULD BE SOMETHING THAT AT LEAST WOULD BE

5    ENCOMPASSED WITHIN THE COURT'S ORDER. AND THE COURT WOULD

6    MAKE A DECISION WHETHER OR NOT -- WHAT THOSE LEGAL COSTS

7    WERE, WHETHER SOME SHOULD OR SHOULD NOT BE INCLUDED WITHIN

8    YOUR COURT'S ORDER.

9        AT A MINIMUM, IT SHOULD HAVE BEEN GIVEN TO YOU,

10    YOUR HONOR, FOR THE IN CAMERA REVIEW. AND IT CLEARLY HAS NOT

11    BEEN PRODUCED TO US.

12        OH, YEAH, HERE IT IS. THE DOCUMENT IS MCK0064875.

13    WE ALSO HAVE SOME ISSUES BECAUSE A NUMBER OF THESE

14    DOCUMENTS REFERRED TO THINGS LIKE BUDGETS THAT -- FOR, LIKE,

15    2002, 2003 AND FROM PRIOR YEARS. AND THOSE BUDGETS WE'VE

16    NEVER HAD IN THIS LITIGATION. BUT, APPARENTLY, SOMEBODY

17    PREPARED A BUDGET FOR THE LONG-TERM CLEAN-UP COST OF THE

18    SITE.

19        AND THOSE BUDGETS WERE -- WE HAVEN'T SEEN THOSE

20    BUDGETS. AND, OF COURSE, IT WOULD BE, I THINK, HIGHLY

21    RELEVANT IF THERE'S BEEN BUDGETS PREPARED ADDRESSING WHAT THE

22    LONG-TERM CLEANUP COSTS OF THIS SITE ARE. AND EVEN IF

Page 21

11.17.06 10-K Hearing

24

23  THEY'RE INTERNAL BUDGETS OF MC KESSON, THOSE BUDGETS ARE

24  BASED UPON NUMBERS LIKE EQUIPMENT COSTS, TESTING COSTS, WHO

25  CAUSED THE CONTAMINATION, ET CETERA.

BABYKIN COURTHOUSE SERVICES (626) 963-0566

1   AND I THINK ONE OF THE MOST CRITICAL ELEMENTS THAT

2   WE ARE REALLY MISSING IS THAT PREVIOUSLY WE HAD SUBMITTED A

3   MOTION TO COMPEL. IT WAS GRANTED BY JUDGE MC MAHON WITH

4   RESPECT TO THE SETTLEMENT MONIES RECEIVED FROM MC KESSON'S

5   PRIOR SUIT AGAINST MC KESSON SETTLEMENT -- INSURANCE

6   CARRIERS. AND I BELIEVE THE ROUGH FIGURE THAT WAS RECEIVED

7   WAS IN THE NEIGHBORHOOD OF 13 MILLION. IT COULD BE 10, BUT --

8   10 TO 13 MILLION, I BELIEVE, WAS THE NUMBER RECEIVED.

9       MC KESSON HAD ARGUED TO THE COURT AS A BASIS FOR

10  NONPRODUCTION OF THOSE SETTLEMENT AGREEMENTS THAT IT WOULD BE

11  IMPOSSIBLE TO ALLOCATE BETWEEN VARIOUS SITES.

12      UPON OUR RECEIPT OF THE SETTLEMENT AGREEMENTS, AND

13  AS WE HAD ARGUED, THOSE SETTLEMENT AGREEMENTS GENERALLY

14  ALLOCATED THE MONEY BETWEEN THREE DIFFERENT SITES. AND THE

15  CONTRACTUAL LANGUAGE OF THOSE SETTLEMENT AGREEMENTS

16  SPECIFICALLY SAID THAT IT COULD ONLY BE USED FOR REMEDIATION

17  OF THE SITES.

18      NOW, UNFORTUNATELY, THE YEARS IN WHICH THE MONEY

19  WAS RECEIVED FROM THE INSURANCE CARRIERS ARE THE VERY YEARS

20  THAT WE DON'T HAVE ANY DOCUMENTS FOR -- NOT A SINGLE STICK OF

21  PAPER OF HOW MC KESSON INTERNALLY ALLOCATED THE MONEY

22  RECEIVED FROM THE INSURANCE CARRIERS. WHICH, OF COURSE, IS

23  EXTREMELY CRITICAL FOR OUR CASE BECAUSE CERCLA, I THINK

24  SECTION 114, AS WE ARGUED TO THE COURT, PREVENTS DOUBLE

Page 22

11.17.06 10-K Hearing

25    DIPPING.

BABYKIN COURTHOUSE SERVICES (626) 963-0566

25

1    IF MC KESSON INTERNALLY ALLOCATED, LET'S SAY OUT OF

2    THE 13 MILLION, SIX MILLION DOLLARS TOWARDS THE SANTA FE

3    SPRINGS SITE, AND THEY STILL HAVE THREE OR FOUR MILLION

4    DOLLARS LEFT OVER FROM THAT MONEY BECAUSE THEY HAVEN'T SPENT

5    IT, THEN UNDER CERCLA THEY MAY NOT BE ABLE TO ADVANCE --

6       THE COURT:  I UNDERSTAND THE RELEVANCE OF WHAT

7    YOU'RE ARGUING --

8       MR. CAUFIELD:  RIGHT.

9       THE COURT:  -- BUT WHAT DOES IT HAVE TO DO WITH

10   THIS MOTION?

11      MR. CAUFIELD:  THIS HAS TO DO WITH THIS MOTION

12   BECAUSE NOT A SINGLE PIECE OF PAPER WAS PRODUCED FOR THOSE

13   YEARS WHEN THE MONEY WAS RECEIVED.

14      AND I WOULD ARGUE IT'S SOMEWHAT INCONCEIVABLE TO

15   BELIEVE THAT A COMPANY WOULD RECEIVE MILLIONS OF DOLLARS

16   EARMARKED FOR CLEAN-UP OF THE SITES, AND THERE'S NOT A SINGLE

17   PIECE OF PAPER THAT REFLECTS HOW THAT MONEY WAS ALLOCATED

18   AMONG THE THREE PIECES OF PROPERTY AT ISSUE IN THIS

19   LITIGATION, OR EVEN HOW THE RESERVE --

20      THE COURT:  YOU'RE STILL NOT EXPLAINING --

21      MR. CAUFIELD:  -- NUMBERS ARE CREATED.

22      THE COURT:  YOU'RE STILL NOT EXPLAINING HOW IT

23   RELATES TO THIS MOTION.

24      MR. CAUFIELD:  OKAY.  THAT WOULD BE THE BACKUP

25   INFORMATION THAT SHOULD BE -- THAT WE SHOULD HAVE.  WHAT I'M

11.17.06 10-K Hearing
BABYKIN COURTHOUSE SERVICES (626) 963-0566

26

1   SAYING IS THOSE YEARS WE DON'T HAVE A SINGLE PIECE OF THE

2   RESERVE ESTIMATE, THE 10-K STUFF.

3       THE COURT:  THE INTERNAL --

4       MR. CAUFIELD:  THE 10-KS REFLECT WHEN THEY --

5       THE COURT:  THE INTERNAL ALLOCATION OF THE

6   SETTLEMENT PROCEEDS YOU ARE ARGUING MUST HAVE BEEN RELIED

7   UPON IN CALCULATING THE FORM 10-K LIABILITY ESTIMATES?  IS

8   THAT WHAT YOU'RE ARGUING?

9       MR. CAUFIELD:  YES, FOR THE RESERVES.  BECAUSE --

10      THE COURT:  WHY IS THAT?

11      MR. CAUFIELD:  WELL, AS WE CITE IN OUR BRIEF, IN

12  MC KESSON'S OWN 10-KS, THEY ACTUALLY REFLECT TO THEIR

13  SHAREHOLDERS IN CERTAIN INSTANCES MONEY HAVING BEEN RECEIVED

14  FROM THEIR INSURANCES CARRIERS WHICH IS REDUCING THEIR

15  LIABILITIES.  AND WE REFERENCED THAT IN OUR BRIEFING TO THIS

16  COURT.

17      AND WE ARGUED THAT INITIALLY BECAUSE WE SAID, WELL,

18  THEY RECEIVED MONEY FROM THE INSURANCE CARRIERS WHICH,

19  APPARENTLY, WAS USED TO REDUCE, ESTIMATE, OR OTHERWISE AFFECT

20  THEIR 10K LIABILITY ESTIMATES.  AND, YET, THE YEARS FOR WHICH

21  THAT MONEY WAS RECEIVED, WE DON'T HAVE A SINGLE PAGE -- NOT A

22  NOTE, NOT A HANDWRITTEN NOTE, NOT AN EMAIL, NOTHING TO HOW --

23  WHAT HAPPENED TO 13 MILLION DOLLARS.

24      THE COURT:  MS. MESCHER WOULD PROBABLY SAY, I

25  DIDN'T RELY UPON THE INTERNAL ALLOCATION OF THE SETTLEMENT

27

BABYKIN COURTHOUSE SERVICES (626) 963-0566

11.17.06 10-K Hearing

1    PROCEEDS.

2         MR. CAUFIELD:  I DON'T BELIEVE THAT SHE WAS IN A

3    POSITION TO DO THAT AT THE TIME YOUR HONOR.  MR. RITCHIE WAS

4    HEAD -- MR. RITCHIE WAS HEAD OF THE DEPARTMENT DURING THAT

5    TIME PERIOD.  SO, SHE DOESN'T --

6         THE COURT:  WHOEVER MADE THE CALCULATIONS WILL

7    PROBABLY SAY THEY DIDN'T TAKE THAT INTO ACCOUNT.

8         MR. CAUFIELD:  THAT MAY BE.  BUT IT'S STRANGE THAT

9    WE HAVE ENTIRE YEARS MISSING WITHOUT A SINGLE PIECE OF PAPER.

10   WE HAVE THE YEARS BEFORE AND WE HAVE THE YEARS

11   AFTER.  IT JUST HAPPENS TO BE THERE IS -- YOU KNOW, AS WE

12   POINTED OUT TO THE COURT, THERE ARE ENTIRE YEARS WHICH WE

13   DON'T HAVE A SINGLE PIECE OF PAPER.  AND THIS IS THE 15TH

14   LARGEST COMPANY IN THE WORLD.  AND THEY'RE SUGGESTING THAT

15   THEY DON'T HAVE AN EMAIL.  THEY DON'T HAVE A SINGLE PIECE OF

16   PAPER WITHOUT -- NOT IN THE ENTIRE COMPANY FOR, I THINK --

17   WHAT IS IT? -- SIX OUT OF THE 16 YEARS, WE DON'T HAVE A

18   SINGLE PIECE OF PAPER.

19        AND THE YEARS HAPPEN TO BE VERY SUSPECT BECAUSE

20   THOSE APPEAR TO BE THE KEY YEARS WHEN THEY RECEIVED MONEY OR

21   OTHER KEY YEARS.  LIKE, FOR EXAMPLE, BEFORE THIS LITIGATION

22   COMMENCED WHEN THEY WERE APPARENTLY ALLOCATING LIABILITY OR

23   DOING THEIR LIABILITY ESTIMATES, WE DON'T HAVE IT FOR I THINK

24   2000, 2001, WHICH COINCIDENTALLY IS THE TWO YEARS PREVIOUS TO

25   THIS LITIGATION EVEN BEING FILED.

28

BABYKIN COURTHOUSE SERVICES (626) 963-0566

1    WHICH CALLS IN THE QUESTION OF WHY ARE WE MISSING

2    -- WHY DO WE SEEM TO BE MISSING THE MOST HIGHLY RELEVANT

3    YEARS THAT HAVE PROBABLY THE MOST IMPORTANCE AND, YET, HAVE

Page 25

11.17.06 10-K Hearing

4    THE ONES -- THE OTHER YEARS THAT APPEAR TO HAVE SOME OF THE

5    LEAST -- AND, CERTAINLY, AT LEAST, WITH RESPECT TO THE

6    INVOICES TO LEGAL COSTS THAT ARE ACTUALLY -- THEY SAY WERE IN

7    THERE.  THOSE WERE NOT GIVEN TO YOUR HONOR AND CERTAINLY NOT

8    PRODUCED.

9        THE COURT:  IF I ORDER MC KESSON AGAIN TO PRODUCE

10   ALL OF THE DOCUMENTS UPON WHICH THEY RELIED IN CALCULATING

11   THEIR FORM 10-K LIABILITY ESTIMATES, DO YOU THINK IN RESPONSE

12   TO THIS ORDER MC KESSON IS GOING TO SAY, OH, HERE ARE ALL

13   THESE OTHER DOCUMENTS THAT ARE WITHIN THE DESCRIPTION IN THE

14   COURT ORDER THAT WE PREVIOUSLY HAVEN'T FOUND OR HAVEN'T

15   IDENTIFIED AND NOW WE ARE PRODUCING THEM?

16       OR, RATHER, ARE THEY GOING TO SAY THE SAME THING

17   MS. WILMS SAYS TODAY, WE PRODUCED EVERYTHING THAT WE AFTER A

18   DILIGENT SEARCH HAVE BEEN ABLE TO LOCATE.  AND IF THERE ARE

19   NO DOCUMENTS FOR PARTICULAR YEARS, THAT'S JUST A FACT?

20       MR. CAUFIELD:  WELL --

21       THE COURT:  WHICH DO YOU THINK IS A MORE LIKELY

22   SCENARIO? -- THE LATTER, RIGHT?

23       MR. CAUFIELD:  I THINK IT STARTS WITH THE FORMER,

24   YOUR HONOR.

25       BECAUSE I BELIEVE THAT AN ORDER CAN BE CERTAINLY

BABYKIN COURTHOUSE SERVICES (626) 963-0566

29

1    TAILORED WHERE -- MC KESSON CERTAINLY HAS THE BACKUP

2    ACCOUNTING INFORMATION TO HOW THEY GOT TO THESE NUMBERS.

3        WHEN YOU HAVE A NUMBER OF -- YOU KNOW, $128,000 --

4    $128,523.17, MC KESSON CERTAINLY HAS AN ACCOUNTING FILE THAT

5    -- FOR JUNE OF 2006, FOR EXAMPLE, SOMETHING LIKE THAT,

11.17.06 10-K Hearing

6    MC KESSON CERTAINLY HAS AN ACCOUNTING FILE THAT REFLECTS --

7    WHEN THEY'RE REFLECTING THINGS IN PENNIES, THEY CERTAINLY

8    HAVE AN ACCOUNTING FILE THAT WOULD REFLECT THE INVOICES THAT

9    SUPPORT THAT NUMBER AND HOW THAT NUMBER WAS REFLECTED FOR A

10    CERTAIN MONTH.

11        FOR EXAMPLE, I GO BACK TO THIS MCK0064930.    I MEAN,

12    YOU HAVE $121,292, OKAY?    THEY CERTAINLY HAVE ACCOUNTING

13    RECORDS WITHIN THE COMPANY.    AND THAT WAS FOR MAY 2005.    THEY

14    CERTAINLY HAVE AN ACCOUNTING FILE IN THE COMPANY THAT WOULD

15    ALLOW THEM TO GENERATE AT A MINIMUM A LIST OF THE INVOICES

16    THAT ADD UP TO $121,292.    AND THE SAME WOULD HOLD TRUE FOR

17    ALL OF THESE MONTHS.    WHICH, AT LEAST, AT A MINIMUM, WOULD

18    ALLOW US TO BE ABLE TO CROSS-CHECK TO MAKE SURE, IN FACT, WE

19    HAVE RECEIVED EVERYTHING.

20        AND THE SAME HOLDS TRUE FOR THESE -- YOU KNOW, WHEN

21    I TALKED ABOUT REFERENCES TO LIKE THEY HAVE -- THEY REFERENCE

22    BUDGETS THAT WE'VE NEVER SEEN.    LIKE, THEY HAVE A 2000- --

23    THEY REFERENCE A 2002, 2003 BUDGET IN THEIR DOCUMENTS THAT

24    APPARENTLY WAS RELIED UPON FOR GENERATING LONG-TERM LIABILITY

25    ESTIMATES.    YET, WE DON'T HAVE THOSE.

BABYKIN COURTHOUSE SERVICES (626) 963-0566

30

1        AND I WOULD CONTEND THAT CERTAINLY IF MC KESSON HAS

2    -- LIKE, FOR EXAMPLE, I REFERENCE THE COURT TO DOCUMENT

3    NUMBER MCK0064865.    IN THE TEXT TOWARDS THE BOTTOM OF THE

4    PAGE -- THIS DOCUMENT IS TITLED, "ANNUAL OPERATING COSTS

5    FORMER MC KESSON FACILITY, SANTA FE SPRINGS, CALIFORNIA,"

6    WHICH APPEARS TO BE A PROJECTION INTO THE FUTURE.    AND IN THE

7    TEXT ON THE BOTTOM IT SAYS, "GROUND WATER MONITORING, 2004

8    COSTS BASED ON 2003 BUDGET."

Page 27

11.17.06 10-K Hearing

9    I'M FAIRLY FAMILIAR WITH THE DOCUMENTS IN THIS CASE

10   HAVING REVIEWED THE BULK, IF NOT ALL OF THEM.  AND I DO NOT

11   RECALL EVER HAVING RECEIVED A DOCUMENT REFLECTING THE 2003

12   BUDGET FROM MC KESSON.  THAT'S AS FAR AS I'M AWARE MISSING.

13   AND WE'VE NEVER SEEN IT.

14       THE SAME WOULD HOLD -- AND, YOU KNOW, FOR THE IWW

15   DISCHARGE MONITORING, AGAIN, 2004 COSTS BASED ON 2003 BUDGET.

16   AND THEN REGULATORY INTERACTION IT SAYS, "2004 COSTS BASED ON

17   2002, 2003 BUDGET."  BUT WE DON'T HAVE THOSE BUDGETS.

18       AND, CERTAINLY, IF THEY'RE GENERATED -- THIS

19   DOCUMENT IS BEING GENERATED RELYING ON ANOTHER DOCUMENT.

20   IT'S REFERENCING ANOTHER DOCUMENT, WHICH TO ME JUST SUGGESTS

21   THAT THE DOCUMENT CERTAINLY EXISTS.  IT WAS GENERATED BY

22   SOMEBODY.  AND IT WAS RELIED UPON.  YET, WE DON'T HAVE IT.

23       THE COURT:  YOU DON'T KNOW THAT IT WAS RELIED UPON.

24       MR. CAUFIELD:  WELL, IT'S REFERENCED, YOUR HONOR.

25   AND IT SAYS, "BASED ON."  SO, I WOULD -- I WOULD INTERPRET

31

BABYKIN COURTHOUSE SERVICES (626) 963-0566

1    THE TERMS "BASED ON" -- A LITERAL INTERPRETATION TO ME WHEN

2    IT SAYS -- SOMETHING SAYS "BASED ON," I INTERPRET THAT AS

3    BEING RELIED UPON.

4        AND IF WE DON'T HAVE IT AND THIS WAS BASED ON, THEN

5    IT SHOULD HAVE BEEN PRODUCED TO, AT LEAST, YOUR HONOR FOR IN

6    CAMERA REVIEW.

7        THE COURT:  NOT UNLESS THEY RELIED ON IT BECAUSE

8    THOSE ARE THE DOCUMENTS YOU SOUGHT.  AND IT WAS THE DOCUMENTS

9    THE COURT ORDERED SUBMITTED.

10       MR. CAUFIELD:  CORRECT, YOUR HONOR.

Page 28

11.17.06 10-K Hearing

11  UNFORTUNATELY, NUMBERS ON A SPREADSHEET ARE NOT

12  RELIED ON.  SPREADSHEETS ARE ESSENTIALLY -- I'M NOT GOING TO

13  SAY WORTHLESS, BUT IF YOU DON'T HAVE THE BACKUP ACCOUNTING,

14  THE INVOICES AND EVEN THE ACCOUNTING FILE THAT TELLS YOU HOW

15  YOU GET TO NUMBERS -- I DON'T THINK IT'S BELIEVABLE TO

16  SUGGEST THAT MC KESSON DOES NOT HAVE AN ACCOUNTING FILE THAT

17  CAN ACCOUNT FOR -- YOU KNOW, WHAT -- YOU KNOW, WITH INVOICE

18  NUMBERS AND EVERYTHING ELSE THAT WOULD ACCOUNT FOR, YOU KNOW,

19  EXPENDITURES ON A MONTH-TO-MONTH BASIS THAT ARE REFLECTED IN

20  THE SPREADSHEET.

21          AND, CERTAINLY, JEAN MESCHER DID NOT SAY, OH, WELL,

22  YOU KNOW, MAY 2005, UHH, $121,292 -- PICK THAT OUT OF THIN

23  AIR.  THERE'S CERTAINLY A DOCUMENT, AN ACCOUNTING FILE THAT

24  SAYS WHAT WAS PAID, INVOICES PAID, INVOICE NUMBERS FOR EACH

25  OF THESE MONTHS.  AND WE HAVE THESE DATING BACK TO THE '90'S.

BABYKIN COURTHOUSE SERVICES (626) 963-0566

32

1  SO, THEY SHOULD HAVE THE ACCOUNTING FILE THAT LISTS AT LEAST

2  THE INVOICES, THE BACK-UP INVOICES.

3          THE COURT:  ONLY MS. MESCHER WITH HER FAILING

4  MEMORY KNOWS THAT WHICH SHE RELIED UPON DOCUMENTWISE.  AND

5  APPARENTLY SHE DIDN'T RELY ON MUCH.  THAT MAY MEAN THAT THE

6  CALCULATIONS WERE DONE HAPHAZARDLY.  THAT MAY MEAN THAT THE

7  CALCULATIONS WERE DONE BASED ON WORD OF MOUTH FROM OTHERS.

8  AND THE OTHER PEOPLE MAYBE DID OR DID NOT LOOK AT DOCUMENTS.

9          MR. CAUFIELD:  WELL --

10         THE COURT:  I DON'T KNOW.

11         MR. CAUFIELD:  YOUR HONOR --

12         THE COURT:  BUT ALL -- BUT ALL THE COURT --

13         MR. CAUFIELD:  WE HAVE MULTIPLE PEOPLE --
                           Page 29

11.17.06 10-K Hearing

14        THE COURT:  BUT ALL THE COURT HAS BEEN ASKED TO DO

15  IN THE ORIGINAL MOTION AND IN THIS MOTION IS TO ORDER THE

16  PRODUCTION OF THE DOCUMENTS ON WHICH MC KESSON RELIED IN

17  CALCULATING THEIR RESERVE ESTIMATES AND FOR SANCTIONS.  AND

18  THAT'S ALL THAT'S BEFORE THE COURT.  AND THAT'S ALL THAT THE

19  COURT CAN DO.

20        I'M NOT SURE WHETHER THE COURT'S GOING TO ORDER

21  SANCTIONS OR NOT.  AND I'M NOT SURE WHETHER IT WOULD BE

22  PROFITABLE OR PRODUCTIVE TO ORDER MC KESSON AGAIN TO PRODUCE

23  THAT WHICH THE COURT PREVIOUSLY ORDERED MC KESSON TO PRODUCE.

24        YOU RAISED SOME CONCERNS ABOUT THE DILIGENCE OF

25  THEIR ATTEMPTS TO OBTAIN AND PRODUCE SOME DOCUMENTS.  AND

33

BABYKIN COURTHOUSE SERVICES (626) 963-0566

1   I'LL TAKE THOSE INTO CONSIDERATION.

2        BUT, ULTIMATELY, THE ORDER MAY -- IF I ISSUE AN

3   ORDER OFF OF THIS MOTION, IT MAY BE MET WITH THE SAME KIND OF

4   RESPONSE THAT YOU'VE BEEN RECEIVING PREVIOUSLY.  THIS IS ALL

5   THAT WE RELIED UPON.  AND YOU MAY THINK TO YOURSELF THAT

6   CAN'T BE RIGHT.  BUT THAT MAY BE THEIR RESPONSE.

7        MR. CAUFIELD:  WELL, IT MAY BE, YOUR HONOR.  BUT

8   WHEN THERE'S AN EMAIL THAT SAYS THAT THE LITIGATION COSTS

9   WERE INCLUDED WITHIN THESE RESERVE FIGURES, AND THAT EMAIL

10  EXPRESSLY SAYS THAT, AND THEN THEY SAID THEY'RE GOING TO

11  DELETE THEM -- NOW, WE DON'T CERTAINLY -- AND YOUR HONOR WAS

12  CERTAINLY NOT PROVIDED WITH THE INVOICES SUPPORTING THE

13  LITIGATION COSTS AS SUPPORTING OF THESE FIGURES FOR IN CAMERA

14  REVIEW AS YOU ORDERED.

15        I THINK, CERTAINLY, THE REPRESENTATIONS BY COUNSEL

11.17.06 10-K Hearing

16    THAT THEY HAD PRODUCED EVERYTHING TO YOUR HONOR FOR HIS

17    REVIEW WHEN CERTAINLY YOU NEVER SAW AND THE PRIVILEGE LOG

18    DOESN'T REFLECT ANY OF THE INVOICES FOR LITIGATION COSTS.

19    YOU DIDN'T GET EVERYTHING, AND IT WASN'T LISTED IN OUR

20    PRIVILEGE LOG.  AND, AT A MINIMUM, IT SHOULD HAVE BEEN GIVEN

21    TO YOUR HONOR FOR REVIEW BECAUSE IT IS SOMETHING THAT WAS

22    RELIED UPON IN CALCULATING THE ESTIMATES.  BECAUSE THIS

23    REFLECTS -- THEY ACTUALLY -- THIS EMAIL ADMITS IT'S

24    REFLECTED.

25        MOREOVER, I'M EXTREMELY CONCERNED THAT IN THE SPACE

BABYKIN COURTHOUSE SERVICES (626) 963-0566

34

1    OF 16 YEARS WE DON'T HAVE A SINGLE TRANSMITTAL LETTER.  AND

2    WE HAVE ONE EMAIL IN 16 YEARS.  AND THIS APPEARS TO BE AN

3    EMAIL THAT JOHN EDGCOMB PRINTED OFF HIS -- OUT OF HIS FILES.

4        SO, WITHIN A 90-BILLION-DOLLAR COMPANY, TO SUGGEST

5    THEY DON'T HAVE A TRANSMITTAL MEMO WHEN ALL THESE PEOPLE ARE

6    ON DISTRIBUTION LISTS, WHERE ARE THE DISTRIBUTION LISTS?

7    THERE SHOULD, AT LEAST, BE A DISTRIBUTION LIST WITHIN -- THAT

8    COVERS FOR EACH OF THESE.

9        AND THE PEOPLE LISTED ON THIS EMAIL, YOUR HONOR, IF

10    YOU LOOK, THIS IS THE MCK0064875 --

11        THE COURT:  I ALREADY LOOKED AT THAT ONE.

12        MR. CAUFIELD:  -- THERE IS ONE, TWO, THREE, FOUR,

13    FIVE, SIX DIFFERENT PEOPLE LISTED ON THIS AS BEING RECIPIENTS

14    OF THIS EMAIL.  SO, OBVIOUSLY, THERE'S A LARGE GROUP OF

15    PEOPLE THAT PARTICIPATES IN THIS PROCESS.

16        AND IF MESCHER ONLY LOOKED WITHIN HER OWN FILES --

17    AND YOU HAVE TO REMEMBER, YOUR HONOR, WE DEPOSED MS. MESCHER

18    IN 2003 AS THEIR PMK CUSTODIAN OF RECORDS.  WE SPECIFICALLY
Page 31

11.17.06 10-K Hearing

19    ASKED HER ABOUT THESE PARTICULAR DOCUMENTS.    AND SHE SAID SHE

20    DIDN'T KNOW ANYTHING ABOUT THEM.    YET, IN EVERY SINGLE ONE OF

21    THESE -- WELL, AT LEAST, FROM THE YEARS IMMEDIATELY AT THE

22    TIME OF THE DEPO AND PRECEDING YEARS, SHE WAS CC'D ON THESE

23    DOCUMENTS.    AND THE DOCUMENTS SAY, "SANTA FE SPRINGS."

24         SO, WHEN WE TALKED TO HER AND ASKED HER IF SHE KNEW

25    ABOUT THE EXISTENCE OF DOCUMENTS, AND SHE DISCLAIMED

35

BABYKIN COURTHOUSE SERVICES (626) 963-0566

1    KNOWLEDGE, AND HADN'T PRODUCED THEM YET, FOR THEM TO COME

2    BACK TO THE COURT NOW AFTER WE, IN FACT, SHOWED THAT SHE JUST

3    RECEIVED DOCUMENTS -- SHE WAS APPARENTLY THE DRAFTER OF

4    DOCUMENTS NOW THEY CLAIM.    YOU KNOW, SHE'S THE SCRIBE.

5         FOR HER NOW TO COME TO THE COURT AND SAY, WELL, I

6    WAS THE SCRIBE, BUT I DIDN'T TELL YOU I WAS THE SCRIBE WHEN

7    YOU DEPOSED ME IN 2003.    AND YOU ASKED ME WHETHER I WAS THE

8    SCRIBE.    NOW, I'M NOW THE SCRIBE.    BUT THIS IS ALL I HAD.

9         THE COURT:    MAYBE SHE HAS A POOR MEMORY.

10         MR. CAUFIELD:    PERHAPS, YOUR HONOR.

11         THE COURT:    LET ME ALLOW MS. WILMS A FEW MINUTES TO

12    RESPOND.    AND THEN I'M GOING TO CONCLUDE THE HEARING.

13         MS. WILMS, ANYTHING YOU'D LIKE TO SAY IN RESPONSE?

14         MS. WILMS:    YES, YOUR HONOR.

15         FIRST, I'LL JUST START WITH THE LAST WITH REGARD TO

16    MS. MESCHER'S DEPOSITION.    THAT'S NOT WHAT SHE WAS ASKED AND

17    NOT WHAT SHE ANSWERED.

18         AS WE REFLECT IN OUR PAPERS, THE QUESTION WAS

19    DIRECTED:

20         "HAVE YOU LOOKED TO DETERMINE WHETHER OR NOT

Page 32

11.17.06 10-K Hearing

36

21     THERE IS SUCH A DOCUMENT IN THE FILES TO SEE

22     IF SUCH A DOCUMENT EXISTS?

23     "HAVE I LOOKED FOR SOMETHING LIKE THAT?" --

24     "QUESTION: YES.

25     "ANSWER: NO."

BABYKIN COURTHOUSE SERVICES (626) 963-0566

1     SO, SHE SAID THAT SHE HADN'T LOOKED FOR IT.  SHE

2     DIDN'T SAY SHE DIDN'T HAVE IT.  AND THE REASON SHE HADN'T

3     LOOKED FOR IT IS BECAUSE IT HADN'T BEEN REQUESTED AND THEN

4     WASN'T UNTIL JULY.  SO, I JUST WANTED TO CLARIFY THE

5     DEPOSITION TESTIMONY ISSUE.

6          ALL I WANT TO DO, YOUR HONOR, IS REITERATE THAT, IN

7     FACT, MR. CAUFIELD SAYS THERE'S NO LONG-TERM PROJECTIONS.

8     THAT'S NOT THE CASE.  THERE ARE LONG-TERM PROJECTIONS IN THE

9     2006 FOR SANTA FE SPRINGS.  AND THAT'S --

10          THE COURT:  WHAT ABOUT THE BUDGET FOR 2003?

11          MS. WILMS:  I BEG YOUR PARDON, YOUR HONOR?  THE

12     BUDGET?

13          THE COURT:  WHAT ABOUT THE BUDGET FOR 2003?

14          MS. WILMS:  I NEVER HAVE SEEN THAT.  AND I --

15          THE COURT:  WHAT ABOUT THE ISSUE OF LEGAL COSTS

16     THAT WERE PREVIOUSLY INCLUDED IN THE ENVIRONMENTAL ESTIMATES?

17          MS. WILMS:  IT LOOKS LIKE THEY WERE DELETED FROM

18     THEM.  I DO KNOW THAT WE SPOKE WITH AND CAROLYN UNGVARSKY DID

19     A DILIGENT SEARCH.  AND IF IT HAD BEEN LOCATED, IT WOULD HAVE

20     BEEN ON THE LOG, SO.

21          THE COURT:  THE SAME ANSWER AS FAR AS THE

22     POSSIBILITY OF TRANSMITTAL LETTERS OR EMAILS THAT DON'T

23     APPEAR?

Page 33

11.17.06 10-K Hearing

24    MS. WILMS: THAT'S CORRECT. AND, AGAIN --

25    THE COURT: WHAT ABOUT -- WHAT ABOUT THE --

BABYKIN COURTHOUSE SERVICES (626) 963-0566

37

1    MS. WILMS: -- THE ISSUE IS WHAT WAS RELIED ON.

2    AND I WOULDN'T THINK A TRANSMITTAL LETTER WOULD BE RELIED ON

3    IN CALCULATING.

4    THE COURT: WOULDN'T THE RECEIPT OF SETTLEMENT

5    FUNDS HAVE TO HAVE BEEN INCLUDED IN THE CALCULATION OF YOUR

6    LIABILITY ESTIMATES?

7    MS. WILMS: I SPOKE WITH MS. MESCHER ABOUT THAT.

8    AND SHE SAID THERE ARE NO DOCUMENTS REFLECTING -- OTHER THAN,

9    OF COURSE, THE BASIC SETTLEMENT AGREEMENTS. THOSE WEREN'T

10    RELIED ON. BUT SHE DID SPECIFICALLY SEARCH FOR THOSE

11    DOCUMENTS.

12    THE COURT: WHICH DOCUMENTS?

13    MS. WILMS: HAVING TO DO WITH INSURANCE. SHE SAID

14    THAT IT WAS A VERBAL DISCUSSION WITH REGARD TO THE INSURANCE.

15    THE COURT: SO, SHE HAD A VERBAL DISCUSSION WITH

16    SOMEBODY ABOUT THE SETTLEMENT AMOUNTS AND THEN FIGURED THE

17    SETTLEMENT AMOUNTS INTO THE ESTIMATES?

18    MS. WILMS: I DON'T THINK SHE RELIED ON THE

19    SETTLEMENT AMOUNTS, YOUR HONOR.

20    THE COURT: SO, THEY DIDN'T FIGURE INTO THE

21    ESTIMATES?

22    MS. WILMS: THAT'S CORRECT.

23    THE COURT: SO, HOW MC KESSON INTERNALLY ALLOCATED

24    THE MONEY RECEIVED FROM THE SETTLEMENTS WAS NOT REFLECTED IN

25    ANY MANNER IN THE 10-K LIABILITY ESTIMATES?

Page 34

11.17.06 10-K Hearing

BABYKIN COURTHOUSE SERVICES (626) 963-0566

38

1     MS. WILMS:  THAT'S MY UNDERSTANDING, YOUR HONOR.

2     THE COURT:  DO YOU WANT TO EXPLAIN, IF YOU CAN, WHY

3  THERE ARE NO PAPERS FOR SOME YEARS?

4     MS. WILMS:  I CAN'T.  I CAN'T JUST -- THEY'VE

5  LOOKED AND THEY'RE JUST NOT THERE.

6     THE COURT:  ALL RIGHT.  THANK YOU.

7     MS. WILMS:  THANK YOU, YOUR HONOR.

8     THE COURT:  THE MATTER IS SUBMITTED.

9     I APPRECIATE THE STATEMENTS, ARGUMENT AND THE

10  ANSWERS FROM ALL COUNSEL.  I WILL ENDEAVOR TO RULE PROMPTLY.

11     THANK YOU.

12     MS. WILMS:  THANK YOU, YOUR HONOR.

13     MR. CAUFIELD:  THANK YOU, YOUR HONOR.

14     (PROCEEDINGS COMPLETED.)

15

16

17

18

19

20

21

22

23

24

25

BABYKIN COURTHOUSE SERVICES (626) 963-0566

Page 35

11.17.06 10-K Hearing

39

C E R T I F I C A T E

1

2

3        I CERTIFY THAT THE FOREGOING IS A CORRECT

4    TRANSCRIPT FROM THE ELECTRONIC SOUND RECORDING OF THE

5    PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

6

7

8

9    _____        _____
     FEDERALLY CERTIFIED TRANSCRIBER        DATED
10   DOROTHY BABYKIN

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT C

Priority ___
Send ___
Enter ___
Closed ___
JS-5/JS-6 ___
JS-2/JS-3 ___
Scan Only ___

CANCELLED

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES-GENERAL

Case No.  CV 01-10532-TJH (Ex)                                    Date: November 17, 2006

Title:  ANGELES CHEMICAL CORPORATION et al. v. McKESSON CORPORATION, et al.

DOCKET ENTRY

PRESENT:

HON.  CHARLES F. EICK, JUDGE

STACEY PIERSON                              N/A
DEPUTY CLERK                          COURT REPORTER

ATTORNEYS PRESENT FOR PLAINTIFFS:     ATTORNEYS PRESENT FOR DEFENDANTS:

None                                          None

PROCEEDINGS:    (IN CHAMBERS)                    (Page 1 of 2)

The Court has read and considered all documents filed in support of and in opposition to
Plaintiffs' "Motion to Compel 10-K Documents Withheld by McKesson and for Sanctions," filed
October 20, 2006.  The Court heard argument on November 17, 2006.

Within twenty (20) days of the date of this order, Defendant McKesson Corporation shall
produce to Plaintiffs all documents upon which any person relied (directly or indirectly) in contributing
in any way to the calculation of McKesson's 10-K reserve estimates, other than documents produced
in response to the Court's September 6, 2006 Order, and other than Documents Nos. 45-63 referenced
in that order.  As Defendant McKesson Corporation previously should have known, if a person's
contribution to the calculation of McKesson's 10-K reserve estimates was verbal, but that person relied
upon a document or documents in formulating that person's verbal contribution, such document or
documents were within the compass of this Court's August 30, 2006 and September 6, 2006 Orders.
All such documents shall be produced in response to the present order.  McKesson Corporation shall
produce the documents in their original, unredacted form.  All potential privilege objections regarding
the documents ordered to be produced herein have been waived by Defendant McKesson's prior failure
to list the documents on a privilege log.

DOCKETED ON CM

NOV 17 2006

BY _____ 064

898

Initials of Deputy Clerk

MINUTES FORM 11
CIVIL-GEN

SCANNED

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES-GENERAL

Case No.  CV 01-10532-TJH (Ex)                    Date:  November 17, 2006

Title:  ANGELES CHEMICAL CORPORATION et al. v. McKESSON CORPORATION, et al.

DOCKET ENTRY

PRESENT:

HON.  CHARLES F. EICK, JUDGE

STACEY PIERSON                              N/A
DEPUTY CLERK                          COURT REPORTER

ATTORNEYS PRESENT FOR PLAINTIFFS:     ATTORNEYS PRESENT FOR DEFENDANTS:

None                                   None

PROCEEDINGS:    (IN CHAMBERS)            (Page 2 of 2)

In preparation for this production, Defendant McKesson Corporation shall perform another, and more thorough, search and inquiry in an attempt to locate documents responsive to this order.

Plaintiffs' request for sanctions is denied without prejudice.

Defendant McKesson Corporation's request for a stay is denied.

Any party seeking review of this order shall cause the preparation and filing of a transcript of the November 17, 2006 hearing.

cc:    Judge Hatter
       All Counsel of Record

MINUTES FORM 11
CIVIL-GEN                                              Initials of Deputy Clerk _____

11/20/2006 10:16:40 AM

Date Transmitted:

2:01-CV-10532

Jeffery Laun Caufield
Caufield and James
2851 Camino Del Rio South, Suite 250
San Diego, CA  92108

Number of Pages:     2

*It is hereby certified that this document was served by first class mail postage prepaid or by fax or e-mail delivery to counsel (or parties) at their respective address or fax number or e-mail address of record.*